**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

| | | |
|---|---|---|
| ROBERT M. TAYLOR, III et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:24-cv-00019-JRH-BKE |
| | ) | |
| UNIVERSITY HEALTH SERVICES, INC. | ) | |
| and PIEDMONT HEALTHCARE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO REMAND</u>**

PROCEDURAL BACKGROUND...................................................................................2

ARGUMENT AND CITATION OF AUTHORITY ....................................................5

I.   Defendants' Removal of this Case was Timely and Proper. ....................................5

II.   Legal Standard – ERISA's Complete Preemption Test. .......................................10

III.  Plaintiffs' Claim Two is Completely Preempted by ERISA Because Plaintiffs Can Bring Their Claim Under ERISA Section 502(a)...............................................................11

    A.   The purported "contract" promising the traditional Medicare supplement benefits is an ERISA plan. ...............................................................................................11

    B.   The ERISA plan does not pay Plaintiffs "wages." ......................................14

    C.   The ERISA plan is not a payroll practice. ..................................................17

    D.   The ERISA plan is not a "governmental plan."..........................................20

    E.   The ERISA plan is not an unfunded "excess benefit plan."......................24

IV.  Plaintiffs' Claim Two Is Completely Preempted By ERISA Because No Other Independent Legal Duty Is Implicated. ...............................................................................25

CONCLUSION.......................................................................................................25

## PROCEDURAL BACKGROUND

Plaintiffs, a group of retired employees of University Health Services, Inc. ("UHS"), brought an action against Defendants in the Superior Court of Richmond County, Georgia (the "Superior Court") on March 21, 2023.  Couching their claims under state law, Plaintiffs sought declaratory relief regarding claimed rights to Medicare supplement benefits to be provided solely in the future, on the basis of an alleged contractual promise to provide Plaintiffs with those benefits for free for the rest of their lives.  For ease of understanding, Defendants herein refer to that initial claim, together with its dependent claim for attorney's fees for bad faith in the underlying transaction, as "Claim One."

On April 19, 2023, Defendants removed the action to this Court on preemption grounds, relying on the Employee Retirement Income Security Act of 1974 ("ERISA"). *See Taylor v. University Health System, Inc.*, No. 1:23-cv-00047-JRH-BKE (*"Taylor I"*).  Defendants asserted that, because the Complaint (then containing only Claim One) sought to enforce Plaintiffs' claimed right to benefits under an ERISA plan, this case fell within the scope of ERISA's exclusive civil enforcement scheme (ERISA Section 502(a)) and therefore arose under federal law for purposes of removal and federal-question jurisdiction. *Taylor I*, Doc. 1.

Plaintiffs moved to remand *Taylor I* to the Superior Court. On December 14, 2023, this Court granted Plaintiffs' motion, holding remand appropriate "because Plaintiffs lack[ed] Article III standing, thereby depriving the Court of subject-matter jurisdiction." *Taylor I*, Doc. 36 at p. 6. As the Court explained, "Plaintiffs' allegations show only there is at most a 'perhaps' or 'maybe' chance Defendants will not provide the alleged benefit at some point in the future, but this possibility is insufficient to establish Article III standing." *Id*.  The Court did not reach or consider the ERISA preemption issue, given the finding that Plaintiffs lacked Article III standing.

Returning to state court, Defendants moved the Superior Court to dismiss the Complaint, which still contained only Claim One, arguing *inter alia* that Plaintiffs lacked standing to pursue Claim One in state court for the same reasons as this Court found a lack of Article III standing.  It is what Plaintiffs asserted in their opposition to the motion to dismiss (the "State Court Opposition") that gave rise to Defendants' second removal:  Plaintiffs argued they had standing to sue over a ripe controversy because the alleged injury was not just the potential non-delivery of benefits in the future, but also <u>past and present breaches</u> of a contractual promise to provide Plaintiffs with a specific kind of medical benefit. Defendants refer to this new claim about past and present breaches as "Claim Two."

The crux of Claim Two is that, rather than providing Plaintiffs with the promised "traditional" Medicare supplement coverage, Defendants have in the past and are presently providing (some) Plaintiffs a supposedly inferior benefit, specifically medical insurance under a Medicare Advantage Plan.  Plaintiffs made the following arguments in their opposition:

- "The benefits that were agreed to be provided were Medicare Supplemental Benefits for traditional Medicare and the Defendants, rather than live up to that obligation . . . ***have told individuals that they have to sign up for Medicare Advantage Plans at a savings to the Defendants, but a cost to the Plaintiffs . . . . This is not about future or hypothetical claims, but actual claims*** as to . . . these employees' agreement[s]." Doc. 1-2, p. 71[1].

- "***What is occurring now is that Piedmont is not providing Medicare supplement policies for traditional Medicare, but is requiring employees who meet the [benefit program] criteria to go to a Medicare Advantage Plan***.  In addition, Piedmont is not living up to its obligation under the contract where the individuals have vested benefits." *Id.*

- "The Plaintiffs in this case . . . are seeking an Order requiring that the Defendants furnish to the Plaintiffs exactly what they agreed to furnish – that is, ***Medicare supplement policies for traditional Medicare insurance and not a supplement to Medicare Advantage Plans.***" Doc. 1-2, p. 73.

- "This is a ***breach of contract [case]*** in which the Defendants have . . . willfully, and intentionally tried to avoid their ***contractual obligations by converting these individuals to a product that is not as good as what [UHS] agreed to provide***." *Id.*

---

[1] For ease of reference, all citations use the ECF-stamped page numbers in the top margin of the page.

In furtherance of their State Court Opposition, Plaintiffs also filed an affidavit of Plaintiff Robert M. Taylor, III (the "Fourth Taylor Affidavit"), offering sworn testimony "[t]hat a controversy exists [today] between the Plaintiffs and Piedmont" because "***what Piedmont now claims it is providing is not the same***" as what was originally promised.  Doc 1-2, pp. 225 – 226 (¶¶ 18 & 26) (emphasis added).  Expounding on Claim Two, Mr. Taylor testified:

> "[T]his case is a contract case to require that University Hospital and Piedmont live up to their contractual obligations and give these employees their 'hidden paycheck' . . . the outsourcing of Medicare to private insurance companies is generally not in the best interests of former employees and retirees and, at the time of the representation being made to employees, the representation was to pay for supplements to traditional Medicare – not a different type of policy."

Doc. 1-2, p. 228 (¶¶ 32 & 33); *see also id.,* p. 225, (¶¶ 20 & 22).

Plaintiffs double down on Claim Two in their Remand Motion (Doc. 6) and Brief (Doc. 6-1) in this Court by <u>continuing</u> to argue Defendants are in breach by requiring certain Plaintiffs to enroll in a Medicare Advantage plan rather than a "traditional" Medicare supplement benefit:

- "UHS, now part of Piedmont, is telling individuals that . . . to receive this hidden paycheck they must agree to enroll in a Medicare Advantage Plan . . . this is not the contract that UHS is obligated to fulfill." Doc. 6-1, p. 1.

- "[P]aying the cost of a Medicare Advantage Plan is not what [UHS] is obligated to provide and, in Affiant's opinion, is a breach of the contract that University Hospital made with those employees."  Doc. 7-1, ¶ 10; *see also id.*, ¶ 8 (same).

Although Claim Two appeared for the first time in the State Court Opposition and the Fourth Taylor Affidavit (not an amended pleading), these papers and the claims asserted therein are no less a part of this case and controversy. In this way, this case became properly removable when Plaintiffs filed their State Court Opposition asserting Claim Two, for which the affected Plaintiffs have standing.  This presents a ripe controversy over which this Court has jurisdiction.

## ARGUMENT AND CITATION OF AUTHORITY

I.    <u>**Defendants' Removal of this Case was Timely and Proper.**</u>

The removal statute governing the timing and propriety of Defendants' removal provides:

…[I]f the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant . . . of a copy of an amended pleading, motion, order or ***other paper*** from which it may ***first be ascertained*** that the case is one which is or has become removable.

28 U.S.C. § 1446(b)(3) (emphasis added). Claim Two first appeared in the State Court Opposition and the Fourth Taylor Affidavit that Plaintiffs filed with the state court on January 26, 2024. Twenty-one days later, on February 16, 2024, Defendants removed the case to this Court (for the second time).  Plaintiffs argue the second removal is untimely and improper because Claim Two has been part of this case all along, so Defendants "should not now be able to use this as 'other paper' giving them the right to remove this repeatedly."  Doc. 6-1, pp. 1-2; *see also* Doc. 6, ¶ 8. Plaintiffs' bald contentions lack merit for at least three reasons.

First, Plaintiffs argue Defendants have no basis for this second removal because they rely exclusively on the Fourth Taylor Affidavit.  The argument ignores that the Fourth Taylor Affidavit was *not* the primary basis for this removal.  Defendants' Notice of Removal (Doc. 1) plainly relies on not only the Fourth Taylor Affidavit but also Plaintiffs' State Court Opposition, to the point of including four block quotations from the State Court Opposition wherein *all Plaintiffs* make various assertions about the alleged wrongdoing forming the basis of Claim Two and the relief sought as a remedy. Plaintiffs cannot diminish the significance of these opposition papers by ascribing all discussion of Claim Two solely to the testimony of one plaintiff.  Plaintiffs' counsel made these assertions about Claim Two in a paper filed on behalf of all 174 Plaintiffs.

Second, Plaintiffs assert the Fourth Taylor Affidavit cannot form the basis for the removal because it "was not a pleading." Doc. 6-1, pp. 2-3. But that doesn't matter. By its terms, 28 U.S.C. § 1446(b)(3) applies to an "amended pleading, motion, order *or other paper*…." Courts have

broadly construed "other paper" as referring to all manner of different documents served in a case, from discovery responses, to briefs, to affidavits, to settlement demands made during litigation. *See Lowery v. Alabama Power Co.*, 483 F.3d 1184, 1213 & nn.63-64 (discussing what can qualify as an "other paper," where it must originate, and what it must contain); *see, e.g., Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 468-69 (6th Cir. 2002) (deposition testimony allowed defendant to ascertain that retirement plan claim was preempted by ERISA thus conferring federal jurisdiction); *Eyak Native Village v. Exxon Corp.*, 25 F.3d 773, 779 (9th Cir. 1994) (reply brief clarifying existence of federal question qualified as "other paper"); *Bramlett v. YRC, Inc.*, 2016 WL 9330340, at *2 (N.D. Ga. 2016) (settlement demand supported second removal); *Sibilia v. Makita Corp.*, 782 F. Supp. 2d 1329, 1331 (M.D. Fla. 2010) (discovery response provided new factual basis to support second removal).  What matters for purposes of satisfying the removal statute is that the other paper with the clarifying or changing information originates with the plaintiff and contains unambiguous information sufficient to give the defendant notice that the case *is*, or by the clarification or change *has become*, removable.  *Middlebrooks v. Johnson & Johnson Co.*, 2008 WL 4003926, at *2 (M.D. Ga. 2008).  Here, the State Court Opposition and Fourth Taylor Affidavit both asserted that the benefits *currently* extended to (some) retirees did not satisfy the alleged promise, meaning an alleged breach of contract has already occurred and is continuing even today.  The retirees affected by that alleged breach have standing to bring that claim (Claim Two), whether for damages, for an order mandating specific performance, or a declaratory judgment as to any ongoing breach.

Third, Plaintiffs argue the Fourth Taylor Affidavit is not an "other paper" demonstrating changed circumstances for purposes of satisfying the removal statute because "this fact was known to Defendant at the time of the first removal."  Doc. 6, ¶ 8.  Presumably, Plaintiffs are referring to the alleged facts Mr. Taylor lays out in the Fourth Taylor Affidavit.  For it is preposterous to assert

that Defendants somehow knew the contents of an affidavit signed in January 2024 at the time of the first removal of this case eight months earlier, in April 2023. *Taylor I*, Doc. 1. Further, the assertion is false. The record of the prior proceeding (*Taylor I*) readily disproves the notion that Defendants knew what Plaintiffs' claim was all along. Pleading a declaratory-judgment case to guide the parties' <u>future</u> conduct, the Complaint seeks a declaration by the court that "Defendants cannot terminate the contract" and "are obligated to pay these benefits for the life of each Plaintiff." Doc. 1-1, p. 8, ¶ 18. Plaintiffs alleged "uncertainty as to whether these contractual benefits will continue in the future." *Id*. ¶ 16. For the alleged harm, Plaintiffs pleaded only that the "uncertainty causes damages to each Plaintiff . . . in that retirement plans for those on a fixed income are difficult to make when they face uncertainty as to the payment of medical insurance in their old age." *Id*. ¶ 17. Other than that strained theory, Plaintiffs did not claim to have *already* sustained damages or other harm. Plaintiffs did not allege in their Complaint or explain in any papers filed in *Taylor I* that the benefits any of them were then receiving were in any way deficient, unsatisfactory, or less than what was supposedly promised. On the contrary, Plaintiffs affirmatively alleged "these benefits are now being paid." *Id*. at pp. 5 – 6, ¶ 12. The Complaint contained *no hint* that the <u>form</u> of benefit (a "traditional" Medicare supplement benefit versus a Medicare Advantage plan), rather than the existence of the benefit, was the focus of Plaintiffs' challenge.

In all *Taylor I* court papers, Plaintiffs' theory of the case, their claimed basis for standing, and the scope of relief sought never changed—it was always anticipation of possible future breach and uncertainty as to the fate of an alleged lifetime of free benefits. In briefing the *Taylor I* motions, Plaintiffs filed a motion, two briefs, and two affidavits by Mr. Taylor. *Taylor I*, Docs. 8, 9, 10, 11, 21. None of those papers contain any mention of any past or present (continuing) breaches or damages for deficient performance of the alleged promise to provide the benefits at issue. None of them raised any issue about what kind of "free Medicare supplemental benefits"

were being provided.[2]  In a supplemental brief Plaintiffs explained that their claims in this case are "nothing but [] breach of contract claims in which Plaintiffs are seeking assurance that these claims will be paid [*in the future*] despite the fact that the Defendants have stated that they would voluntarily continue this benefit but not as part of a contract." *Taylor I*, Doc. 22, p. 2. In the same paper, Plaintiffs complained that "Defendants are now not willing to state that they would continue to provide these benefits in the future." *Id.,* p. 3. But Plaintiffs still made no assertion that benefits presently being paid for were in any way deficient or less than allegedly promised.  Plaintiffs argued they have standing because Defendants "have refused to make a firm commitment that they will continue to pay for this benefit, and have taken the position that they are paying for this benefit on a voluntary basis." *Id*., p. 4.  On that record, by Plaintiffs' admission, the benefit at issue was being provided.

Plaintiffs' Second Supplemental Brief in Opposition to Motion to Dismiss (*Taylor I*, Doc. 29) for the first time mentions two different types of benefits but never asserts that paying for the lesser benefit is a breach of contract. The brief states that a "number of individuals [] were persuaded to utilize a Medicare advantage plan." *Taylor I*, Doc. 29, p. 2. A companion third affidavit by Mr. Taylor also describes two different types of benefits, and Mr. Taylor testifies that UHS "encourag[ed]" some retirees to sign up for a Medicare Advantage Plan, while Mr. Taylor considers a "Medicare Supplement Policy . . . better insurance coverage."  *Taylor I*, Doc. 30, p. 3. Even with that new detail about the different kinds of benefits being provided, Mr. Taylor did not assert that paying for the Medicare Advantage Plan was deficient or in any way a past or present breach of the supposed promise to provide the benefits at issue.

---

[2] Another brief from Plaintiffs (*Taylor I*, Doc. 20) likewise contained no assertion of providing deficient benefits in the past or present, and no allegation of past or present breaches of contract. In context, Plaintiffs' assertion that Defendants "have refused to pay the Plaintiffs the benefits that they were promised" (*Taylor I*, Doc. 20 at p. 9) refers only to Defendants' contention that they are not obligated to continue to pay for the benefits at issue, *in the future*, for the entire life of all qualifying retirees.

As the above progression demonstrates, at no time while Plaintiffs were in this Court in *Taylor I* arguing for their own standing did Plaintiffs *ever* assert, or even suggest, that the Complaint stated a claim for a past or present (continuing) breach of contract on the theory that paying for a Medicare Advantage Plan for certain Plaintiffs was in any way presently causing any Plaintiffs harm sufficient to confer standing.  The Court's ruling in *Taylor I* confirms that no such assertion or suggestion was made.[3]

Only after remand to state court, when facing dismissal of their case for lack of standing under Georgia law, did Plaintiffs finally come up with an assertion that Defendants were "requiring"—no longer "encourage[ing]" but "requiring"—qualifying retirees "to go to a Medicare Advantage Plan, which Plaintiffs contend "is not as good as what University Hospital agreed to provide for them." Doc. 1-2, p. 73. Having argued in their Motion to Remand in *Taylor I* that this case was not removable, Plaintiffs cannot now reverse their position and argue that *Taylor I* was removable all along, in that Claim Two was secretly lurking in the papers without announcing itself and without Plaintiffs ever explaining to this Court what their claim really was or that Plaintiffs had standing because a breach of contract had already occurred.

Most importantly, this Court held in *Taylor I* that this case was not removable as it was then framed.  That issue has been decided.  Plaintiffs cannot now argue, contrary to the position they took then and contrary to the holding of this Court, that this case really was removable then. Because this case *became* removable for the first time on January 26, 2024, when Plaintiffs filed their State Court Opposition and the Fourth Taylor Affidavit, Defendants' (second) removal on February 16, 2024, was timely.

---

[3] The Court in *Taylor I* held Plaintiffs lacked Article III standing to pursue their claims in this Court because Plaintiffs were only complaining about "Defendants' position that they are 'voluntarily' providing Plaintiffs the alleged benefit . . . not because [Plaintiffs] have suffered any actual harm."  *Taylor I*, Doc. 36, p. 6.

Even if (as Plaintiffs assert) Claim Two has always been part of the initial Complaint, Defendants could not *ascertain* as much until the State Court Opposition and Fourth Taylor Affidavit explained what this case is really about. *See Weaver v. Alabama Marine Patrol*, 2018 WL 2100586, at *2, (S.D. Ala. 2018) (briefs do not amend pleadings but can clarify them).  As set forth above, neither could the Court ascertain the presence of Claim Two.  Since *ascertainment* of removability triggers the 30-day period in 28 U.S.C. § 1446(b)(3), *see Lowery*, 483 F.3d at 1212 n.63, *Gilhooly v. Walmart Stores East, L.P.*, 2021 WL 3828867, at *1 (M.D. Fla. 2021), the filing of the State Court Opposition and Fourth Taylor Affidavit started the removal clock, whether they asserted a new Claim Two or merely clarified that Claim Two had been in this case (but hiding) all along, because it was only those papers that allowed Defendants to *ascertain* the presence of removal jurisdiction by unambiguously showing that (some) Plaintiffs have Article III standing sufficient to confer jurisdiction on this Court.  Either way, this removal is timely.

## II.     Legal Standard – ERISA's Complete Preemption Test.

Because Defendants' second removal of this action was timely, the Court may properly address whether Plaintiffs' newly stated Claim Two is completely preempted by ERISA's exclusive civil enforcement scheme and, therefore, arises under the laws of the United States for purposes of removal jurisdiction. The Supreme Court and Eleventh Circuit apply a two-part test for that analysis.  A state law claim is completely preempted by ERISA, and removable to federal court, if the following two conditions are met: (1) the plaintiff must have been able to, at some point in time, bring his claim under ERISA's civil enforcement provision, ERISA § 502(a), and (2) there must be no other legal duty, independent of ERISA, that is implicated by the defendant's actions.  *Conn. State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1344 (2009).  As set forth below, both of ERISA's complete preemption conditions are met here.

III.     **Plaintiffs' Claim Two is Completely Preempted by ERISA Because Plaintiffs Can Bring Their Claim Under ERISA Section 502(a).**

Plaintiffs' Claim Two is premised on the notion that Defendants have breached the terms of their alleged contractual obligation to Plaintiffs because they have failed to provide (some of) them with a specific kind of medical benefit – a "traditional" Medicare supplement benefit. Specifically, Plaintiffs contend Defendants have breached a contract because Defendants are forcing certain Plaintiffs who satisfy the benefit program's eligibility criteria into a Medicare Advantage plan, which is allegedly a less generous form of supplemental medical coverage than what was initially agreed upon.  As set forth in further detail below, the contract that Defendants have allegedly breached is an ERISA plan. Thus, Plaintiffs may avail themselves of all rights and remedies available to them under ERISA § 502(a), ERISA's exclusive civil enforcement scheme.

Plaintiffs attempt to avoid application of ERISA – and thus, ERISA § 502(a) – by arguing the purported contract upon which they base their Claim Two is not an ERISA plan because it does not provide for the provision of any ERISA-governed benefits. Instead, Plaintiffs argue the benefits are "wages" provided in the form of a "hidden paycheck" and are provided as part of a "payroll practice."  Alternatively, Plaintiffs argue the purported contract is not an ERISA plan because it is subject to ERISA's "governmental plan" exemption and its "excess benefit plan" exemption.  Doc. 6, ¶¶ 3-5 & 13-17; Doc. 6-1, pp. 2 – 5.  None of these arguments have merit.

A.     **The purported "contract" promising the traditional Medicare supplement benefits is an ERISA plan.**

It is clear from the record, including Plaintiffs' own papers, that the "contract" upon which Plaintiffs base their Claim Two falls squarely within ERISA's definition of an "employee welfare benefit plan."

Section 3(1) of ERISA defines "employee welfare benefit plan" as:

any plan, fund *or program* which was heretofore or is hereafter *established or maintained by an employer . . . for the purpose of providing for its participants*

> or their beneficiaries, ***through the purchase of insurance or otherwise . . . medical***, surgical or hospital care or ***benefits***, or [various additional enumerated categories of benefits].

29 U.S.C. § 1002(1) (emphasis added); *see also Randol v. Mid-West Nat. Life Ins. Co. of Tenn.*, 987 F.2d 1547, 1550 (11th Cir. 1993).

The "employee welfare benefit plan" definition is so broad that any type of arrangement will constitute an ERISA plan if it satisfies the "plan, fund, or program" test. An ERISA "plan, fund, or program" is present whenever, from the surrounding circumstances, a "reasonable person" can "ascertain [1] the intended benefits, [2] a class of [intended] beneficiaries, [3] the source of financing, and [4] procedures for receiving benefits." *Williams v. Wright*, 927 F.2d 1540, 1543 & 1548 (11th Cir. 1991) (citations omitted) (letter promising post-retirement compensation, health insurance coverage and payment of premiums for such coverage was an ERISA plan); *see also Clark v. Unum Life Ins. Co. of Am.*, 95 F. Supp. 3d 1335, 1350-51 (M.D. Fla. 2015) (applying broad ERISA plan test; holding benefit program was ERISA plan even though it was not labeled "ERISA" and employer had claimed it never intended to establish or maintain an ERISA plan).

Notably, a benefit "program" alone is sufficient to substantiate an ERISA plan finding – nothing more. As the Eleventh Circuit has held, ERISA coverage issues are to "be construed liberally." *Williams*, 927 F.2d at 1543. No formal written plan is required; nor is a written plan a prerequisite. *See* 29 U.S.C. § 1002(1) (defining "employee welfare benefit plan" as "*any* plan, fund *or* program . . ."); *Donovan v. Dillingham*, 688 F.2d 1367, 1372 (11th Cir. 1982) (written plan document not required for ERISA plan finding); *Clark*, 95 F. Supp. 3d at 1347-48 (ERISA "plan, fund, or program does not have to be written or otherwise formalized . . . what matters is whether the employer 'intended to establish or maintain a plan to provide benefits to its employees as part of the employment relationship'"); *Lipscomb v. Transac, Inc*., 749 F. Supp. 1128, 1133 (M.D. Ga. 1990) ("Clearly, an ERISA plan and coverage may emerge where no writing is present").

Here, there is no dispute as to any of the relevant ERISA plan facts.  Plaintiffs' own papers demonstrate the purported contract Plaintiffs have with Defendants satisfies ERISA's statutory definition of an "employee welfare benefit plan."  Specifically, Plaintiffs allege:

- The existence of a <u>plan, fund, or program</u> – namely, the Medicare supplement benefit program. Doc. 1-1, pp. 6 – 8 (Compl., ¶¶ 5, 7 – 9, 11 – 12).

- The program was <u>established or maintained by an employer</u> – namely, UHS initially established the program and later UHS and Piedmont, in their employer capacities, continued to maintain the program. Doc. 1-1, pp. 5 – 6 (Compl., ¶¶ 1, 3, 4, 7).

- The program was established and maintained <u>for the purpose of providing eligible participants</u> – through the purchase of health insurance – <u>medical benefits</u> in the form of Medicare supplement benefits.  Doc. 1-1, pp. 6 – 8 (Compl., ¶¶ 7 – 12).

Record evidence further demonstrates the challenged Medicare supplement benefit program satisfies the ERISA "plan, fund or program" test enumerated by the courts:

- The <u>intended benefits</u> are retiree medical benefits in the form of Medicare supplement benefits.  Doc. 1-1, pp. 6 – 7 (Compl., ¶¶ 5, 7 – 10).

- The <u>intended beneficiaries</u> are those employees employed by UHS prior to January 1, 2005, who had 30 years of service at the time of their termination of employment with UHS and are Medicare eligible.  Doc. 1-1, pp. 6 – 7 (Compl., ¶¶ 5, 7 & 9).

- The <u>sources of financing</u> the benefits are the premiums paid by UHS from its general assets. Doc. 1-1, pp. 6 – 7 & 11 – 17 (Compl., ¶¶ 7 – 9 & Ex. A) (showing annual premiums paid by UHS to Aetna and United); *see also* Belkoski Aff., ¶ 15 (attached).

- The <u>procedure for receiving the benefits</u> is that UHS provides eligible retirees the requisite election paperwork to enroll in the program, and then UHS pays the medical coverage insurance premiums directly to the medical insurance carriers, Aetna and United.  Doc. 1-1, pp. 6 – 7 (Compl., ¶¶ 7 – 8 & Ex. A, pp. 12 – 17); Doc. 7-1 (Fourth Taylor Aff.), ¶ 7; *see also* Belkoski Aff., ¶¶ 15 & 16 (attached).

Nothing more is required to substantiate an ERISA plan finding here.[4]

Tellingly, none of the cases Plaintiffs rely upon in their Remand Motion and Brief involve

---

[4] Plaintiffs appear to argue an ERISA plan can only exist if an employer files a Form 5500 for the plan or program with the U.S. Department of Labor. That is not the law. A purported lack of an ERISA Form 5500 filing does not preclude an ERISA plan finding. *See Donovan,* 688 F.2d at 1372. In any event, retiree medical coverage provided as part of the program was reported on Form 5500s filed with the DOL. *See* Belkoski Aff., ¶ 17 & Ex. D thereto.

the type of benefits Plaintiffs seek here – medical benefits. In fact, courts addressing the Medicare supplement issue, or similar issues involving an employer's payment of premiums for medical coverage, consistently hold these types of benefits are welfare benefits governed by ERISA. *See Williams*, 927 F.2d at 1548 (letter from employer promising to pay health insurance premiums for employee's post-retirement medical coverage was ERISA welfare benefit plan); *Chamblin v. Towers Watson Delaware, Inc.,* 2018 WL 10593892, *2 (N.D. Ala. July 26, 2018) (healthcare reimbursement arrangement, specifically a Medicare supplement plan offered by plaintiff's former employer, was employee welfare benefit plan governed by ERISA); *Randol*, 987 F.2d at 1549-51 (employer's payment of premiums for employees' health coverage was an employee welfare benefit plan under ERISA); *Zanaty v. Harris*, 2008 WL 11423846, *4 (N.D. Ala. 2008) (ERISA plan created when majority owner of company purchased health insurance coverage for his children, who were also employees, and paid for the coverage through the company); *see also Alday v. Container Corp. of Am.*, 906 F.2d 660, 663 (11th Cir. 1990) (retiree health insurance program was ERISA "welfare benefit plan" and not a retirement or "pension plan").

For all of these reasons, the purported contract upon which Plaintiffs' premise their Claim Two is an ERISA plan. ERISA therefore affords Plaintiffs the ability to pursue their claim for breach under ERISA Section 502(a).

### B.      The ERISA plan does not pay Plaintiffs "wages."

The next argument Plaintiffs make to avoid an ERISA plan finding is that the alleged contract is simply a promise to pay Plaintiffs "wages" in the form of a "hidden paycheck." Doc. 6-1, p. 3; Doc. 6, ¶ 13. The argument grossly mischaracterizes the nature of the benefits sought by Plaintiffs as a remedy for the purported breach and is therefore unsupported by fact or law.

The benefits sought are not "wages" as that term is defined under the Internal Revenue Code (the "Code") or any other applicable employment law. They are medical benefits provided

in the form of "traditional" Medicare supplemental coverage, which are excluded from income under §105(b) of the Code. 26 U.S. Code § 105(b) (amounts expended for medical care). Nor are the premiums for the medical coverage "wages." Those benefits are subject to the income exclusion under § 106(a) of the Code for employer-provided health plan coverage. 26 U.S. Code § 106(a). If any of these benefits were considered wages (which they are not), Plaintiffs would be required to pay income taxes on the medical benefits received and the amounts paid on their behalf.

The medical benefits also are not paid to Plaintiffs in the form of a "paycheck." In fact, no direct payments are made through the retiree medical program to any program participant. As set forth above, UHS remits the premiums directly to the health insurance carriers in consideration for providing the medical coverage to eligible participants. Plaintiffs receive the medical coverage as a result of UHS's payments to the carriers, but they do not have the luxury of using or directing those payments for their own purpose. Although Plaintiffs misleadingly label the benefit program as an "agreement to reimburse" eligible retirees for the supplemental medical coverage (Doc. 6-1, p.3), presumably to avoid the fact that payments are not issued to any program participant, the reality is no such reimbursement arrangement exists.  Belkoski Aff. ¶ 15 (attached hereto).

Plaintiffs rely on *Fort Halifax Packers Co. v. Coyne*, 482 U.S. 1 (1987) to bolster their argument that the contractually promised benefits are not ERISA-governed because they are akin to a "paycheck." Doc. 6-1, p. 3. The case is easily distinguishable given it involved a state law requiring the employer to provide a one-time, lump sum severance payment (not medical benefits) triggered by a plant closing. The Court held the obligation to issue a single set of payments to a group of employees at a single point in time did not require any *ongoing* administrative scheme

and so the obligation did not arise from an ERISA plan.[5]  The Court reasoned there was no ERISA plan because the employer "assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control." 482 U.S. at 12. By contrast, here, the alleged ERISA plan involves a purported legal obligation to provide Plaintiffs with a specific kind of medical benefit on a regular basis, an obligation that is more than simply writing a one-time check to a set of employees who all separate from employment at the same time. There is a clear *ongoing* administrative scheme – one that involves a predictable (purported) obligation to provide benefits on a rolling basis to retirees who, at various points in time, meet the eligibility criteria. As part of their ongoing administration, UHS must: (i) identify and select the health insurance carriers that provide the retiree medical coverage, (ii) select the insurance contracts with those insurers that will be made available to eligible retirees, (iii) administer an eligibility scheme in which each retiree seeking to participate in the program must complete the requisite election paperwork at the time they retire, (iv) undertake a case-by-case review to determine eligibility, and (v) regularly remit premium payments directly to the insurance carriers in amounts that differ each year based on applicable premium rates and the number of eligible participants. Administrative activity is also required (albeit on the part of the health insurers) when processing medical claims and benefits.[6] Thus, the one-time payment obligation imposed by the state law in *Fort Halifax* differs greatly from the ongoing requirements imposed

---

[5] Plaintiffs incorrectly argue the "ongoing" administrative scheme requirement means a "day-to-day" administration requirement.  Doc. 6, ¶¶ 5 & 14.  None of the cases relied upon by Plaintiffs even suggest that is the case. Indeed, no such requirement exists under the governing case law.

[6] The fact that the insurance carriers administer the medical claims piece is irrelevant.  The lack of employer involvement in an aspect of ongoing administration does not establish the absence of an ERISA plan.  *See Randol v. Mid–West Nat'l Life Ins. Co.,* 987 F.2d 1547, 1550 n. 5 (11th Cir. 1993) (there is no requirement that the employer play any role in administering the plan for it to be an ERISA employee welfare benefit plan).

by the ERISA plan here.[7]

Finally, it is worth noting that Plaintiffs' exclusive focus on the "ongoing administrative scheme" requirement is misplaced. That test is largely applied by courts in the severance or separation agreement context. It is not the primary test applied by courts in the medical benefits context, likely because a severance payment is fundamentally different in nature from the medical benefits Plaintiffs claim here. Regardless, even assuming the primacy of the "ongoing administrative scheme" requirement, the ERISA plan here satisfies that requirement.

## C.     The ERISA plan is not a payroll practice.

The plain language of the payroll practice regulation demonstrates the exception does not apply here. ERISA's regulations exclude certain payroll practices from being considered "employee welfare benefit plans."  Specifically, the exception provides as follows:

> **Payroll practices.**  [T]he terms "employee welfare benefit plan" and "welfare plan" shall not include—
>
> (1) Payment by an employer of compensation on account of work performed by an employee, including compensation at a rate in excess of the normal rate of compensation on account of performance of duties under other than ordinary circumstances, such as—
> **(i) Overtime pay,**
> **(ii) Shift premiums,**
> **(iii) Holiday premiums,**
> **(iv) Weekend premiums;** [and]
>
> (2) Payment of an employee's normal compensation, out of the employer's general assets, on account of periods of time *during which the employee is*

---

[7] The remaining cases upon which Plaintiffs rely are distinguishable for similar reasons. *Syrowik v. Vineyard Development Corp.*, 2021 WL 100372, *3 (M.D. Fla. Jan. 12, 2021), *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253 (4th Cir. 2005), and *Patel v. Sugen, Inc.*, 354 F. Supp. 2d 1098 (N.D. Cal. 2005), all held the challenged contracts calling for severance payments were not ERISA plans because only a single event triggered the one-time payments due and, like in *Fort Halifax*, the employers could simply "cut a check" directly to the employees to fulfill their obligations. *Donavan v. Branch Banking and Trust Co.*, 220 F. Supp. 2d 560, 565-67 (S.D. W.Va. 2002) found no ongoing administrative scheme because the plaintiff's individual agreement provided for a simple lump-sum payment, the employer was not required to undertake any long-term obligation with respect to the payment, and the payment became due following the occurrence of a single event (plaintiff's own termination) rather than any time the employer terminated its employees. *Dabertin v. HCR Manor Ca re, Inc.*, 177 F. Supp. 2d 829 (N.D. Ill. 2001) lends no support to Plaintiffs' argument because the court in that case held the severance agreement was an ERISA plan.

> ***physically or mentally unable to perform his or her duties***, or is ***otherwise***
> ***absent for medical reasons***. . .

29 C.F.R. § 2510.3-1(b)(1) & (2) (emphasis added).[8]

Plaintiffs do not specify the specific payroll practice exception they are relying upon. However, the benefits Plaintiffs seek – the "traditional" form of Medicare supplement benefits – are <u>not</u> listed in any of the enumerated categories. The benefits are not compensation on account of work performed, such as overtime pay or holiday premiums, and they also are not payments in the form of salary continuation on account of an employee's inability to work for medical reasons. Thus, the benefits Plaintiffs seek are not wages subject to the payroll practice exception.

Nor are the Medicare supplement benefits paid directly to any of the Plaintiffs through payroll, which, as the exception's name suggests, is a prerequisite.  In fact, no "payroll practice" is involved at all given that Plaintiffs are <u>retirees</u> and no longer employed.  *See, e.g., Musmeci v. Schwegmann Giant Super Markets, Inc.,* 332 F.3d 339, 348 (5th Cir. 2003) (holding grocery voucher benefit program provided to retirees was an ERISA plan rather than wages subject to the payroll practice exception because it provided a benefit to *retired* employees). As set forth above, rather than being paid directly to any of the Plaintiffs through payroll, the benefits are paid for by UHS through premiums remitted directly to the insurance carriers providing the medical coverage.

Although there are not many reported cases addressing the payroll practice exception in the context of retiree benefits (likely because, based on the plain language of the regulation, there can be no serious dispute over whether the payroll practice exception applies to retiree medical benefits), courts that have addressed the issue hold the exception does not apply to <u>retiree</u> benefits.

---

[8] Other types of compensation to an employee are also enumerated under the payroll practice exception, including compensation paid to an employee for: (i) periods of time the employee performs no duties because the employee is on vacation or absent on a holiday; (ii) absences due to active military duty, jury duty or testifying in official proceedings; (iii) periods of time an employee is engaged in training; and (iv) periods of time an employee is on sabbatical leave or pursuing further education. 29 C.F.R. § 2510.3-1(b)(3). None of these exceptions apply here.

*See, e.g., Musmeci*, 323 F.3d at 348 (grocery voucher program providing benefits to retirees was not excepted under ERISA as a payroll practice); *Sullivan v. Cuna Mut. Ins. Soc.*, 683 F. Supp. 2d 918, 933 - 34 (W.D. Wis. 2010), *aff'd,* 649 F.3d 553 (7th Cir. 2011) (sick leave account policy used to pay for retiree health insurance premiums was not an exempt payroll practice).

Plaintiffs also argue that the challenged benefit program is subject to the payroll practice exemption because no separate fund was set aside to pay for the benefits.  Doc. 6, ¶ 4; Doc. 6-1, p. 4. The argument mischaracterizes the requirements set forth in the payroll practice regulation. Use of employer assets is only one condition. Moreover, the argument's premise suggests that *any* benefit program funded by employer (or former employer) assets falls under the exception, which obviously is not the case.  Indeed, the majority of ERISA-governed welfare benefits, including the Medicare supplemental benefits at issue here, are paid for using employer (or former employer) assets. *See, e.g., Chamblin*, 2018 WL 10593892 at *2 (reimbursement program funded by employer assets to pay for supplemental Medicare coverage was an ERISA-governed welfare plan); *Randol*, 987 F.2d at 1549-50 (employer's payment of premiums for employees' health coverage was an employee welfare benefit plan under ERISA); *Clark,*  95 F. Supp. 3d at 1350-51 (employer's payment of premiums for disability insurance coverage was an ERISA plan).[9]  The purpose of the payroll practice exception is not to exclude <u>all</u> programs funded by employer assets, but rather to distinguish those programs under which employers fund ERISA plans from those programs where employers provide funds to pay wages.

Plaintiffs cite a handful of cases they claim support a finding that the Medicare supplement benefit program is subject to the payroll practice exception.  Notably, however, none of these cases

_____

[9] Plaintiffs' argument also ignores Eleventh Circuit precedent holding that the payment of benefits by an employer through the employer's general assets "does not affect the threshold question of ERISA coverage." *Williams*, 927 F.2d at 1544; *see also Woods*, 2017 WL 727766 at n.9 (same); *Clark*, 95 F. Supp. 3d at 1351 (fact that employer paid premiums out of its own funds was sufficient to satisfy the "source of financing" requirement).

involve medical or retiree benefits. Instead, they all involve payment of the types of benefits expressly listed in the exception – *i.e.*, wage replacement benefits paid to employees unable to work due to sickness or disability or wage payments made to employees for unused vacation time.[10] Thus, there is no legal support for Plaintiffs' erroneous contention that the "payroll practice" excepts the benefits at issue here from coverage under ERISA.

**D.    The ERISA plan is not a "governmental plan."**

Plaintiffs alternatively argue the benefit program is exempt from ERISA because it is a "governmental plan." Doc. 6, ¶¶ 15-16. ERISA defines "governmental plan" as a "plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing." 29 U.S.C. § 1002(32). There is no dispute Defendants are not governmental entities. Instead, Plaintiffs argue – without any support – that UHS is an "instrumentality" of the government because "UHS is owned by the [RCHA]" which is itself an instrumentality of government, and/or because UHS is controlled by the RCHA pursuant to the terms of a 1984 lease agreement (the "Lease Agreement"). Doc. 6, ¶¶ 15-16.[11] This argument is without legal or factual basis.

**1.    Governing case law dooms Plaintiffs' argument.**

As an initial matter, Plaintiffs fail to cite a single case in their Remand Motion holding that

---

[10] *See Stern v. Int'l Bus. Mach. Corp.*, 326 F.3d 1367 (11th Cir. 2003) (sickness and accident income plan providing wage replacement benefits to employees unable to work); *Massachusetts v. Morash*, 490 U.S. 107 (1989) (policy of paying terminated employees for unused vacation time at termination); *Bilheimer v. Fed. Exp. Corp.*, 2009 WL 1324202 (S.D. Fla. May 13, 2009) (short-term disability wage replacement benefits). Plaintiffs also cite to *Jeffrey v. Am. Ventures Realty Investors, Inc.*, 2009 WL 10701431 (S.D. Fla. 2009), but that case did not involve the payroll practice exception at all. Rather, the case involved a different exception known as the "bonus program" exception, which only applies to ***pension*** benefit plans, not the type of *welfare* benefit plan at issue here providing retiree medical coverage. 29 C.F.R. § 2510.3-2(a). Even assuming the exception could apply here (which it cannot), it only extends to payments made by an employer to an employee as a bonus for work performed. Here, the challenged benefits are not being paid to Plaintiffs at all, let alone in the form of a "bonus" for work performed.

[11] Plaintiffs reference the Lease Agreement in their Remand Motion (Doc. 6, ¶ 15) but do not attach it. Defendants therefore have attached it as Exhibit A to Mr. Belkoski's affidavit, submitted herewith.

a private, nonprofit corporation (such as UHS here) can become a quasi-governmental employer for purposes of satisfying ERISA's governmental plan exemption. This is not surprising given that Defendants are unaware of any court issuing such an attenuated holding.

Instead, courts addressing the issue have all rejected the same legal argument Plaintiffs proffer here. For example, the plaintiffs in *Darden v. DeKalb Med. Ctr. Inc.*, 2008 WL 11319981, *2 (N.D. Ga. Jan. 7, 2008) argued their employer, Dekalb Medical Center, Inc., should "be viewed as an instrumentalit[y]" of the state for purposes of ERISA because the employer was originally created by a hospital authority. The court held the governmental exemption did not – and could not – apply to the disputed benefits because the hospital employer had incorporated and became a private, nonprofit hospital system. *Id.* The *Darden* court further explained that "[a]lthough the hospital leases property from the hospital authority, the hospital authority does not manage the hospital's day-to-day business affairs, nor did it establish the employee benefit plan." *Id*. This is precisely the scenario Plaintiffs seek to challenge here – an employee benefit plan established by UHS (not the RCHA) in its private, nonprofit capacity, long after UHS and the RCHA entered into their 1984 Lease Agreement.[12]

The district court in *Germaine v. Unum Life Ins. Co. of Am.*, 2004 WL 2624873, *11 (N.D. Ga. Sept. 23, 2004) held similarly. There, the court ruled that <u>neither</u> the hospital authority nor the nonprofit employer (despite having originally been created by the hospital authority) was a government instrumentality for purposes of ERISA's governmental plan exemption. *Id.* The facts at issue in *Germaine* were nearly identical to those here, including that the hospital authority had established the hospital employer (Athens Regional Medical Center), the hospital authority leased its assets to Athens Regional pursuant to a lease agreement, under which the hospital authority

---

[12] There is no dispute the retiree medical benefit program Plaintiffs challenge here was established by UHS in its private employer capacity. *See* Doc. 1-1, Compl., p. 6, ¶ 3.  Nor are there any allegations by Plaintiffs that the RCHA was involved in the creation or maintenance of the benefit program.

transferred all employees, operations and liabilities of the hospital to Athens Regional, and under which Athens Regional took over the daily operation of the hospital. *Id.*, at *1. Finally, like here, Athens Regional established and maintained the challenged benefits program without any involvement by the hospital authority. *Id.*

Plaintiffs attempt to avoid application of the above cases by relying on *Williams-Mason v. Reliance Standard Life Ins.*, 2006 WL 1687760, *1 (S.D. Ga. June 16, 2006). Doc. 6-1, p. 5. But *Williams-Mason* did not involve a private employer entity at all. Rather, the hospital authority itself provided the challenged benefits. The court reasoned that the governmental plan exemption applied due to the unique characteristics of the employer *hospital authority*, "lying somewhere between a local, general-purpose governing body (such as a city or county) and a corporation." *Id.* The *Williams-Mason* court never addressed the legal issue involved here, namely whether a private nonprofit employer such as UHS can be deemed a governmental instrumentality under ERISA.

The remaining cases cited by Plaintiffs – *Richmond Cnty. Hosp. Auth. v. Richmond Cnty.*, 255 Ga. 183 (1985) and *Smith v. Northside Hosp. Authority*, 302 Ga. 517 (2017) – do not address ERISA's governmental exemption issue at all. Plaintiffs appear to cite these cases in an attempt to argue that UHS is a governmental instrumentality under ERISA because it is allegedly subject to a separate state law, the Georgia Open Records Act (the "ORA"). But even assuming these cases held that UHS was subject to the ORA (which they do <u>not</u>), the analysis as to whether a private entity is subject to a state open records law has no bearing on whether that same entity is an instrumentality of government for purposes of satisfying ERISA's governmental plan exemption, a completely different legal analysis under federal law.[13]

---

[13] Moreover, nothing in the *Richmond Cnty. Hosp. Auth.* decision bolsters Plaintiffs' theory that the RCHA and UHS are so closely intertwined that UHS may be deemed a governmental instrumentality. To the contrary, the court upheld the 1984 Lease Agreement because to hold otherwise would "overlook[] the principle that corporations are separate and distinct entities in the eyes of the law." *Id.* at 186.

2.      UHS is not an "instrumentality" of government.

Contrary to Plaintiffs' unsubstantiated assertion, UHS is not "owned" by the RCHA. The RCHA has no (and never had any) ownership interest in UHS. Belkoski Aff., ¶ 9. Rather, Piedmont Healthcare, Inc. – a private Georgia nonprofit corporation – is the sole member of UHS. *Id.* As such, UHS is subject to Piedmont Healthcare's system-wide governance, controls, processes, and procedures. *Id.*, ¶ 10.

As separate and distinct legal entities, UHS and the RCHA have a contractual relationship that is governed by the Lease Agreement. The Lease Agreement demonstrates that UHS operates the facilities covered by the Lease Agreement without any control by the RCHA. The Lease Agreement expressly provides that UHS (not the RCHA) is responsible for the day-to-day business affairs and operations of the hospital facilities covered by the Lease Agreement. *See* Belkoski Aff., ¶ 11; *see also id.*, Ex. A, Section 3 ("UHS shall operate University Hospital . . ."; explaining UHS shall have sole discretion to determine whether to augment services); Section 7 ("UHS shall operate University Hospital and its related facilities in compliance with all restrictions and regulations . . ."); Section 10(b) ("UHS is permitted to use all such assets in the operation of University Hospital . . . UHS shall have complete discretion in deciding whether or not to repair or replace any [] assets"); Section 11 ("UHS assumes all operating and other liabilities of RCHA"); Section 14 ("UHS shall be the governing body of University Hospital as contemplated by the bylaws of the Medical Staff of University Hospital, and UHS shall have all the rights and authorities of the governing body"); Section 19 ("UHS shall have the right and authority to make and enforce such reasonable rules and regulations as, in its judgment, may from time to time be needed for the safety, care and cleanliness of the leased premises"). This is precisely the same relationship that the *Darden* and *Germaine* courts both held was insufficient to constitute a governmental instrumentality under ERISA.

Even more significantly, Section 12 of the Lease Agreement demonstrates that (like in *Darden* and *Germaine*), all employees of the RCHA became employees of UHS, a separate nonprofit corporation, more than 40 years ago (December 1984).  Belkoski Aff., ¶ 12 & Ex. A thereto. Since that time, UHS has been "solely responsible for the payment of all salaries and employee benefits,"[14] and has had full discretion over employment and employee benefits decisions with respect to current and former UHS employees, including "the discretion to determine and adjust salaries and employee benefits," with <u>no</u> input or control by the RCHA.  *Id*., ¶ 12.  Since December 1984, UHS employees have been treated as private employees and not as employees of the RCHA or any public or municipal corporation or entity.  *Id*., ¶¶ 14.  Thus, there is no basis for Plaintiffs' contention that UHS provides the retiree medical benefits to Plaintiffs here in the capacity of a quasi-governmental employer.

### E.      The ERISA plan is not an unfunded "excess benefit plan."

Plaintiffs argue in a lone sentence that the plan promising the "traditional" form of Medicare supplement benefits is exempt from ERISA as an "excess benefit plan" under 29 U.S.C. § 1002(36) and 29 U.S.C. § 1003(b)(5). Doc. 6, p. 4. The exemption has no application here. An "excess benefit plan" is one that is established "solely for the purpose" of providing <u>retirement</u> benefits in excess of the benefit and contribution limits imposed on qualified <u>retirement</u> plans (such as 401(k) and 403(b) plans) by Section 415 of the Internal Revenue Code of 1986, as amended ("Code Section 415"). 29 U.S.C. § 1002(36); 26 U.S.C. § 415. The plan at issue here is not a retirement plan; it is a plan that provides retirees with *welfare* benefits, namely medical benefits. *See Alday*, 906 F.2d at 663 (retiree health insurance plan, providing medical insurance, is a welfare

---

[14] Section 12 of the Lease Agreement contains a reference to a pension plan previously sponsored by the RCHA for RCHA employees. That now-terminated pension plan transferred to UHS's sole sponsorship in connection with entry into the Lease Agreement, and UHS treated and maintained the plan as an ERISA plan until the plan's termination in 2018. Belkoski Aff., ¶ 13 & Ex. B thereto.

benefit plan and not a retirement or "pension" plan as defined by ERISA).[15]

## IV.    Plaintiffs' Claim Two Is Completely Preempted By ERISA Because No Other Independent Legal Duty Is Implicated.

The operative question in connection with this second prong of the complete preemption test is whether Defendants' alleged conduct violates a legal duty that exists independently of ERISA. Governing case law demonstrates there is no separate legal duty here. The only misconduct asserted by Plaintiffs in support of Claim Two are past and present breaches of contract (*i.e.*, the failure to provide the promised "traditional" Medicare supplement benefit). Because the purported contract upon which Plaintiffs rely to bring their claim constitutes an "employee welfare benefit plan" under ERISA, Defendants' purported refusal to act in a manner consistent with the alleged contract is "inextricably intertwined" with the plan and negates the existence of any independent contractual duty. *See Woods*, 2017 WL 727766 at *9 (rejecting plaintiff's argument that former employer had independent legal duty not to breach a contract promising benefits following termination because the promise was an ERISA plan) (citing *Conn. State Dental Ass'n*, 591 F.3d at 1353 (breach of contract claims based on denial of ERISA benefits "arise solely under ERISA or ERISA plans and not from any independent legal duty") and *Borrero*, 610 F.3d at 1304 ("state law claims[ ] based predominately on their contracts" sufficiently "implicate[d] legal duties dependent on the interpretation of an ERISA plan" and were completely preempted)).

## CONCLUSION

Defendants' second removal is not an attempted second bite at the apple. It's a first bite at an entirely new apple. Plaintiffs have now clarified that this case and the relief sought—an order requiring Defendants to abide by the alleged promise to provide Plaintiffs a specific kind of medical benefit—includes what Defendants refer to as Claim Two. That clarification provided

---

[15] To qualify as an excess benefit plan, the plan also must be maintained solely to provide benefits in excess of Code Section 415 limits (annual dollar caps). The medical plan here has nothing to do with those limits.

new unambiguous information that supports a conclusion that at least some Plaintiffs do have standing, which brings this case within this Court's jurisdiction and makes this case properly removable now.

Through the other papers filed in state court in January 2024, Plaintiffs either (a) asserted a new Claim Two for breach of contract and related relief (for which they have standing and this Court has jurisdiction), or (b) *as Plaintiffs maintain*, clarified that the Complaint as initially pled actually included claims and requests for relief for which they did and do have standing, though Plaintiffs never explained any of this in *Taylor I*. If the former, the Court should retain jurisdiction over and proceed with hearing at least Claim Two. If the latter, the Court should exercise jurisdiction over the entirety of this case, based on Plaintiffs' position that this is a single-claim lawsuit for all Plaintiffs.

Respectfully submitted,

*/s/ Emily E. Friedman*       /s/ *Troy A. Lanier*
Emily E. Friedman, Georgia Bar No. 659432 Troy A. Lanier
Colin Đăng Delaney, Georgia Bar No. 216858 Georgia Bar No. 437775
SMITH GAMBRELL & RUSSELL, LLP  TROY LANIER LAW
1105 W. Peachtree Street, NE     430 Ellis Street
Suite 1000           Augusta, GA 30901
Atlanta, GA 30309       Telephone: (706) 550-1941
404.815.3948         Facsimile: (706) 724-6064
404.815-3509 (facsimile)      tlanier@tlanierlaw.com
efriedman@sgrlaw.com
cdelaney@sgrlaw.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that, on this day, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to attorneys of record.

Dated: March 14, 2024.      */s/ Emily E. Friedman*
               Emily E. Friedman